IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHRISTOPHER LEE BARNES,

        Plaintiff,

   v.

MICHAEL GOWER, MS.WHELAN,
COLLETTE PETERS, STEVE FRANKE,

        Defendants.

No. 2:12-cv-01880-HZ

OPINION & ORDER

Matthew S. Kirkpatrick
Kenneth R. Davis, II
LANE POWELL, PC
601 S.W. Second Avenue
Suite 2100
Portland, OR 97204

Attorneys for Plaintiff

Vanessa A. Nordyke
OREGON DEPARTMENT OF JUSTICE
1162 Court Street N.E.
Salem, OR 97301

Attorney for Defendants

1 - OPINION & ORDER

HERNÁNDEZ, District Judge:

Plaintiff Christopher Lee Barnes brings this action against Defendant Bridgett Whelan, Medical Services Manager at Two Rivers Correctional Institution (TRCI), under 42 U.S.C. § 1983, alleging inadequate medical treatment in violation of the Eighth Amendment.[1] Plaintiff alleges that Defendant was deliberately indifferent to his serious medical needs because she failed to ensure that he received proper treatment for migraine headaches. Defendant moves for summary judgment. Plaintiff moves to strike supplemental evidence included with Defendant's reply brief. For the reasons that follow, both motions are denied.

## BACKGROUND

Plaintiff was incarcerated at TRCI from May 16, 2012 to November 21, 2012, among other time periods. Plaintiff suffers from "extremely painful" migraine headaches. Barnes Decl. ¶ 5. His migraines are so excruciating that they make him vomit, lose his vision, lose consciousness, lose his temper, and exercise poor judgment, all of which have contributed to attempts to commit suicide. In November of 2011, Plaintiff was prescribed nine doses of Imitrex per month as treatment for his migraines. Plaintiff must take Imitrex as soon as he begins to feel the symptoms of a migraine in order for the drug to be effective.

In June of 2012, Plaintiff began requesting help from medical personnel at TRCI to figure out why he was having such frequent migraines and how he could receive more effective treatment. Plaintiff repeatedly requested an MRI. In addition, he requested help obtaining a medical record from his childhood that he believed would show that he had brain damage.

---

[1] Plaintiff's claims against Defendants Michael Gower, Collette Peters, and Steve Franke, were previously dismissed. See Opinion & Order, May 23, 2013 [32].

2 - OPINION & ORDER

Plaintiff first requested an MRI at "sick call" on June 11, 2012; he made numerous other requests at subsequent sick calls.[2] Kirkpatrick Decl. Ex. 2, at 27. He made the same request through at least four inmate communications ("kytes") sent to Defendant on August 5, August 20, September 13, and September 23, 2012. Kirkpatrick Decl. Ex. 3, at 3; Ex. 4, at 1; Ex. 5, at 3,4. In his kytes, Plaintiff complained that he had made the MRI request during sick call but no action had been taken. Defendant delegated the duty to respond to inmate communications to other nurses, who in turn directed Plaintiff to go to sick call. Plaintiff also filed a grievance with prison officials concerning the same issue, which he pursued through an appeal that was ultimately denied. Kirkpatrick Decl. Ex. 3; Ex. 5, at 1; Ex. 5, at 2.

Plaintiff informed a nurse during sick call on September 20, 2012, that he had "frontal lobe brain damage" as a child. Kirkpatrick Decl. Ex. 2, at 34. Plaintiff also alluded to possible brain damage in his kytes, stating that there were juvenile mental health records from the Oregon Youth Authority (OYA) indicating that his then-psychiatrist, Dr. Thiel, believed he might suffer from front temporal lobe brain damage.[3] Kirkpatrick Decl. Ex. 5, at 4, Ex. 8, at 2, 4; Barnes Decl. Ex 1, at 1. It is now clear that the mental health record Plaintiff referred to was a "progress

---

[2] While the parties do not define "sick call," the Court infers from the record that when inmates want medical treatment, they sign up for sick call in order to see a nurse.

[3] Defendant argues that statements attributed to Dr. Thiel about Plaintiff's possible brain damage are hearsay and may not be admissible for their truth. Def.'s Reply at 14. However, as used by Plaintiff, the progress report is not hearsay because it is offered to prove when and whether Defendant knew that a document existed stating that Plaintiff might have brain damage, not to prove the truth of Dr. Thiel's statements. See United States v. Beecroft, 608 F.2d 753, 760 (9th Cir. 1979) (explaining that a statement offered to prove a person's knowledge rather than truth of the matter asserted is not hearsay). Further, Plaintiff's expert witness, Dr. Jerry K. Larsen, does not rely on the progress report for the truth of Dr. Thiel's statements, but he instead gives his opinion that learning of the progress report should have prompted Plaintiff's medical providers to obtain the medical records underlying the statement. Larsen Decl. ¶ 14. Accordingly, the Court considers the progress report along with the other evidence in the record.

3 - OPINION & ORDER

report" from January 10, 1995, when Plaintiff was 12 years old, prepared by his program manager at a specialized foster care program. This progress report reflects that Dr. Thiel believed that "many of [Plaintiff's] sudden outbursts and negative behaviors may be due to frontal lobe brain damage." Barnes Decl. Ex 1, at 2. On October 11, 2012, at sick call, Plaintiff once again requested help from a nurse to obtain his medical records from the OYA, stating that he had been told that he needed a medical staff person to request them. Kirkpatrick Decl. Ex. 2, at 36. The nurse followed up with Defendant, who stated that "if medical wants the information we will request it" but also that Plaintiff's attorney could obtain his medical records at any time. Id. On October 12, 2012, the sick call nurse made a note that she had "reiterate[d]" to Plaintiff that "he can request information from any medical/psychological/dental/optical visit that he has had. And he doesn't need to have a provider request [the information]." Id.

Plaintiff also communicated to Defendant and other medical personnel at TRCI that his treatment plan was not working. He told a nurse at sick call that nine doses of Imitrex per month were insufficient because he was experiencing headaches every other day. In response to his complaint about his dosage of Imitrex, a nurse's progress notes indicate that Plaintiff was "advised to call if he has a migraine and no [I]mitrex is available so that we can see where the issue is because historical evidence does not support insufficient medication." Kirkpatrick Decl. Ex. 2, at 34. In response to his grievance related to the same issue, Nurse Wettlaufer wrote:

> In your grievance you state that [Defendant] Mrs. Whelan is not doing her job when someone else answers your communications to her. All Health services staff answers all communications. You are requesting to have an MRI, have your fines paid, and copies of your health care record free, and $800,000. At this time there is no medical indication for an MRI. You are currently prescribed Imitrex for your headaches. A review of your medication administration record indicates that since July 19, 2012 you have taken only three doses of Imitrex. Hopefully this medication is working for you. If you would like a copy of your heath care records, please send a communication to Mrs. Hawkins and she

4 - OPINION & ORDER

can help you to get this; however, it is not free. The grievance process does not allow for damages to be assessed. There is a different avenue for this.

Kirkpatrick Decl. Ex. 4, at 3.

On October 3, 2012, in response to Plaintiff's repeated requests for an MRI, Nurse Gruenwald performed a neurological examination of Plaintiff. Although she informed Plaintiff that it was doubtful that an MRI would "yield any info[rmation] that would change" Plaintiff's plan of care, she agreed to forward Plaintiff's MRI request to the Oregon Department of Corrections' Therapeutic Level of Care (TLC) committee. Kirkpatrick Decl. Ex. 2, at 35.

On October 15, 2012, Defendant reviewed Plaintiff's medical records and drafted a letter to Plaintiff on behalf of Dr. Shelton, the Medical Director at TRCI, stating that "Ms. Gruenwald's exam did not indicate an MRI was indicated; however, she is going to present your request to the TLC committee for their recommendation." Kirkpatrick Decl. Ex. 7, at 2. Further, the letter explained:

> There is nothing in your health care record reflecting a brain injury or need for medical evaluation of this condition. You recently requested ODOC Health Services assist you in getting your OYA health records. You have been advised that ODOC Health Services has your pertinent medical records. You have been housed within the ODOC nine of the past ten years, these medical records are located at TRCI.

Kirkpatrick Decl. Ex. 7, at 2. On October 16, 2012, the TLC committee rejected Plaintiff's request for an MRI as "not medically necessary at this time[.]" Kirkpatrick Decl. Ex. 9, at 1. The next day, Plaintiff filed this lawsuit.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and

5 - OPINION & ORDER

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## DISCUSSION

**I.      Motion to Strike**

Plaintiff submits a motion to strike supplemental evidence submitted with Defendant's reply. Alternatively, Plaintiff asks for leave to file a sur-reply. The Court denies both.

The motion to strike is denied because Defendant's supplemental evidence is responsive to Plaintiff's response brief. Furthermore, almost a year passed from when Defendant moved for summary judgment and Plaintiff filed a response brief. In that time period, the parties conducted discovery, the results of which are the materials that Defendant seeks to submit.

The Court declines to grant Plaintiff leave to file a sur-reply because it would have no impact on the Court's decision regarding this motion. Generally, new evidence presented in a reply should not be considered without giving the non-movant an opportunity to respond. Spencer v. Sharp, 487 F. App'x 424, 425 (9th Cir. 2012) cert. denied, 134 S. Ct. 97 (2013) (citing JG v. Douglas Cnty. Sch. Dist., 552 F.3d 786, 803 n. 14 (9th Cir. 2008). Here, however, Plaintiff will suffer no prejudice by not being allowed to submit a sur-reply, because the Court denies Defendant's motion for summary judgment. See, e.g., In re Aircraft Investor Res., LLC, No. ADV 10-03246, 2011 WL 2292313, at *1 (Bankr. D. Or. June 8, 2011) ("Extending further opportunities to respond should and must be limited to situations where a party has been unfairly or improperly prejudiced by the submission of new evidence with a reply."). The Court notes that the case has been pending since October 17, 2012; therefore, judicial efficiency favors resolving this motion without unnecessarily extending the time for briefing.

## II.    Eighth Amendment Claim of Inadequate Medical Care

The government has an "obligation to provide medical care for those whom it is punishing by incarceration" and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under 42 U.S.C. § 1983. Estelle v. Gamble, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference to serious medical needs." Id. at 104. In the Ninth

Circuit, the test for deliberate indifference consists of two parts. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). First, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Id. (citing McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1991), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc)). Second, the plaintiff must show that the defendant's response to the need was deliberately indifferent. Id. (citations omitted).

A. Plaintiff's Serious Medical Need

Indications that a plaintiff has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." McGuckin, 974 F.2d at 1059–60.

Defendant argues that Plaintiff did not have a serious medical need because he received adequate medical care for his migraines. However, Plaintiff submits a declaration from his expert, Dr. Jerry Larsen, that asserts that the medical care Plaintiff received was inconsistent with the standard of medical care for the diagnosis and treatment of headaches. Furthermore, Plaintiff states that during the time period in question, he continued to have migraines with severe side effects such as vomiting, losing consciousness, and losing his vision. These symptoms would significantly affect an individual's daily activities. Viewing the facts in the light most favorable to Plaintiff, the Court finds there is a genuine issue of material fact as to whether Plaintiff had a serious medical need.

B. Deliberate Indifference

After showing that the medical need was serious, a plaintiff must then show that the defendant acted with deliberate indifference to that need. Estelle, 429 U.S. at 104. "Deliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. Id. Rather, the prisoner must show that the course of treatment undertaken was medically unacceptable under the circumstances, and that the defendant chose this course in conscious disregard of an excessive risk to plaintiff's health. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" for reasons unrelated to the medical needs of the prisoner. Hunt v. Dental Dep't., 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. McGuckin, 974 F.2d at 1060; see also Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators." Hunt, 865 F.2d at 200.

Plaintiff argues that Defendant was deliberately indifferent to his serious medical needs by failing to ensure he received adequate treatment for his migraines.[4] He alleges that Defendant

---

[4] Plaintiff's Complaint focuses more narrowly on his request for an MRI to determine the cause of his migraines. However, the Court construes his claim to allege in more general terms a failure to receive adequate treatment, because Plaintiff was pro se at the time he filed his Complaint. See

9 - OPINION & ORDER

knew that his treatment was not working, yet she failed to do anything to change his treatment plan or to pursue his request for an MRI to gain more information about the cause of his pain.

Plaintiff raises issues of fact as to whether his treatment plan was effective. He argues that Imitrex was not always available when he needed it and that, even when he was able to take Imitrex, sometimes it was not effective in relieving his pain. Plaintiff presents evidence that, starting in June of 2012, Plaintiff could not keep his Imitrex in his cell because it was designated as "not for inmate self-administration."[5] Barnes Decl. ¶ 7. Plaintiff contends that he only had access to his medication twice a day at "med line," and thus could not take it at the onset of his symptoms. Plaintiff also states that he had more than nine headaches each month, exceeding the number of prescribed doses. Kirkpatrick Decl. Ex. 2, at 34. The record reflects one instance, in February of 2012, in which Imitrex did not effectively stop a migraine. Kirkpatrick Decl. Ex. 2, at 12. It also reflects two brief intervals in which Imitrex was not available at TRCI on March 28 and May 18–21 of 2012. Kirkpatrick Decl. Ex. 2, at 23, 25.

Defendant testified that, in general, when an inmate's medication is not available in his cell, the inmate may access that medication at any time by making a request to a guard. Kirkpatrick Decl. Ex. 1, at 34–35. Furthermore, a progress note by Nurse Gruenwald from October 3, 2012 suggests that Imitrex did effectively treat Plaintiff's headaches. Kirkpatrick Decl. Ex. 2, at 35. Additionally, Plaintiff's own kytes imply that Imitrex effectively treated his

---

Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("A document filed pro se is 'to be liberally construed,' Estelle, 429 U.S., at 106 and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,'" ibid. (internal quotation marks omitted). Cf. Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice")).

[5] Plaintiff also asserts without evidentiary support that "Nurse Whelan took away [Plaintiff's] in-cell Imitrex[.]" Pl.'s Resp. at 7–8. The record shows that someone named Dr. Cowin ordered that Plaintiff's medication be removed from his cell. Kirkpatrick Decl. Ex. 2, at 31.

migraines when he was able to take it on time. E.g., Kirkpatrick Decl. Ex. 3, at 3. However, Defendant does not purport to know or remember if Plaintiff was able to access Imitrex when he needed it. Thus, on this record there is an issue of material fact as to whether Plaintiff could access his Imitrex in time to stop his migraines, particularly when it was designated as not for inmate self-administration; whether he was prescribed enough Imitrex to treat his symptoms; and whether he suffered significant pain as a result of the inadequacy of Imitrex as a treatment.

Plaintiff also presents issues of fact as to Defendant's state of mind; that is, whether Defendant was aware that Imitrex was ineffective and whether she intentionally denied or delayed treatment. Plaintiff alleges that Defendant knew that he wanted an MRI as early as June 11, 2012, when he made the request at sick call. Barnes Decl. ¶ 10. Over the following four months, Plaintiff repeatedly requested an MRI through four kytes he sent to Defendant, a formal grievance and appeal, and numerous other verbal requests at sick call. Plaintiff contends that Defendant ignored his requests. See, e.g., Kirkpatrick Decl. Ex. 3, at 3; Ex. 4, at 1; Ex. 5, at 3,4. Plaintiff repeatedly asserted that he wanted to have an MRI in order to learn the underlying cause of his migraines.

At the time of Defendant's deposition, which was approximately two years after the incidents at issue in this case, Defendant did not recall whether she had ever seen the kytes Plaintiff addressed to her. See, e.g., Def.'s Reply Att. B, at 14; Kirkpatrick Decl. Ex. 1, at 21-22. She also stated that she would have seen Plaintiff's email containing his grievance but she "probably would not have opened it and read it" because the grievances are generally "dispersed to managers and health services." Def.'s Reply Att. B, at 13. However, Defendant acknowledged that her job was to oversee the daily operations of staff and nurse managers, and to ensure that

11 - OPINION & ORDER

inmates had "access to care when needed." Kirkpatrick Decl. Ex. 1, at 9. Therefore, drawing all inferences in the light most favorable to Plaintiff, the Court finds that an issue of fact exists as to the amount of information that Defendant had regarding Plaintiff's ongoing complaints and whether Defendant intentionally delayed treatment. See Jett, 439 F.3d at 1097 (explaining that whether defendant received plaintiff's letter requesting dental care was a question of fact). Plaintiff may be able to show that Defendant was aware of Plaintiff's repeated complaints about the adequacy of his treatment and could have referred the MRI request to the TLC committee sooner.

Plaintiff may also be able to show that the delay caused by Defendant led to further injury. While delay, standing alone, does not constitute an Eighth Amendment violation, see Hunt, 865 F.2d at 200; see also Shapley, 766 F.2d 404 at 407 ("mere delay of surgery, without more, is insufficient to state a claim of deliberate indifference") (citing Estelle, 429 U.S. at 106); here, Plaintiff repeatedly complained of ongoing pain and suffering cause by his migraines.

The cases cited by Plaintiff are illustrative. In Hunt, 865 F.2d at 200, the Ninth Circuit reversed summary judgment for defendants when plaintiff was able to show that their delay in providing him with dental treatment—specifically, new dentures—caused him further injury such as bleeding gums, breaking teeth, and an inability eat properly. Id. Similarly, in Fields v. Gander, 734 F.2d 1313, 1314 (8th Cir. 1984), summary judgment for the defendants was inappropriate when the plaintiff alleged that the defendants' delay in arranging for a dentist to extract plaintiff's infected tooth exacerbated plaintiff's pain and suffering as the dental condition worsened.

Here, a factfinder could infer that any delay by Defendant in investigating Plaintiff's complaints or referring his MRI request to the TLC committee exacerbated his injury.[6] Plaintiff submits Dr. Larsen's affidavit in order to demonstrate that TRCI medical staff failed to comply with the standard of care in treating Plaintiff's migraines and that "MRI imaging is indicated" in Plaintiff's case. Id. ¶ 11.

Finally, Plaintiff argues that Defendant knew that the TLC committee could not properly diagnose and treat Mr. Barnes' headaches because she failed to obtain and provide the committee with "critical medical records." Pl.'s Resp. 14. Specifically, Plaintiff alleges that he repeatedly asked Defendant to obtain his juvenile medical "records"—a January 10, 1995 report stating that Plaintiff's psychiatrist believed that he had front temporal lobe brain damage.

Defendant submits testimony from Dr. Dewsnup, a member of the TLC committee, who explains that because there was no indication that Plaintiff was suffering from any condition other than migraines, the possibility of brain damage was not relevant to the decision of whether to provide him with an MRI. When shown the 1995 report at his deposition, Dr. Dewsnup stated that it was not a medical record and instead appeared to have been written by a lay person. According to Dr. Dewsnup, the TLC committee would not have considered the progress report even if they had seen it because the committee only considers medical records.[7] Moreover, he explained that there was no reason to believe that the underlying medical records from Plaintiff's psychiatrist, Dr. Thiel, would have made any difference to the TLC committee because Nurse Gruenwald's neurological exam had disclosed "no baseline medical abnormality," and therefore

---

[6] Plaintiff also alleges that Defendant directed Nurse Manager Wettlaufer to deny his MRI request. Pl.'s Resp. 13. The Court finds no evidentiary support for this allegation.

[7] Only the progress report, and not any underlying OYA medical records, are a part of the record of this case.

13 - OPINION & ORDER

any possible brain damage was "[n]ot really relevant to his migraines." Def.'s Reply Att. A, at 45. Furthermore, Nurse Gruenwald stated that her neurological examination of Mr. Barnes disclosed no evidence that he was suffering from anything other than "classic migraine headaches." Gruenwald Decl. ¶ 4. She explained that the progress report would have made no difference in her opinion that Mr. Barnes was suffering from classic migraine headaches, and therefore the "best course of action was to continue his then-current plan of care[.]" Id. ¶ 5.

However, Plaintiff submits the statement of Dr. Larsen that:

The Report references several diagnoses and information that are relevant to diagnosing and treating Mr. Barnes' migraine headaches, including historical information to assist in determining whether or not an MRI or other diagnosis or treatment is indicated. In my opinion, based on my training, experience, and the standards in the medical community, the standard of medical care for the diagnosis and treatment of headaches would clearly require obtaining available medical records related to a medical opinion that Mr. Barnes suffers from an unspecified organic brain syndrome.

Larsen Decl. ¶ 14.

A mere difference in opinion regarding the proper course of treatment is not deliberate indifference. See Lopez v. Smith, 203 F.3d 1122, 1131 (9th Cir. 2000); see also Jackson, 90 F.3d at 332. However, if Defendant's decision not to obtain the progress report and any other available medical records was "medically unacceptable under the circumstances," then Plaintiff could establish a deliberate indifference claim. See Jackson, 90 F.3d at 332. Given Dr. Larsen's statements about the standard of care in the medical community, Plaintiff raises an issue of fact as to whether the committee should have had access to the report before making a decision about his treatment plan.

To summarize, viewing the facts in the light most favorable to Plaintiff, there are factual disputes as to whether Plaintiff's treatment plan was effective, whether Defendant knew that it

14 - OPINION & ORDER

was ineffective, whether Defendant intentionally denied or delayed treatment, whether the delay of treatment led to further injury, whether Defendant intentionally failed to obtain the OYA report and provide it to the TLC committee, and whether the committee should have had access to the report before making a decision about his treatment plan. Taken as a whole, Plaintiff raises issues of fact as to whether Defendant was deliberately indifferent.

### III.    Qualified Immunity

Establishing whether a government official is entitled to qualified immunity is a two-step process. The court must first determine whether, examining the facts in the light most favorable to the plaintiff, the official violated the plaintiff's constitutional rights. Clement v. Gomez, 298 F.3d 898, 903 (9th Cir. 2002) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If the court concludes that the official violated the plaintiff's constitutional rights, then it must determine if the law governing that right was clearly established. Id.

An inmate has a constitutional right not to have his medical providers employed by the State treat his condition with "deliberate indifference." Actkinson v. Vargo, 284 F. App'x 469, 472 (9th Cir. 2008) (citing McGuckin, 974 F.2d at 1059). Plaintiff raises issues of fact as to whether Defendant was deliberately indifferent to Plaintiff's serious medical needs and, therefore, whether she is entitled to qualified immunity.

///

///

## CONCLUSION

Defendant's motion for summary judgment [43] is DENIED. Plaintiff's motion to strike [107] is DENIED.

IT IS SO ORDERED.

DATED this \_\_\_17\_\_\_ day of \_\_\_Feb.\_\_\_, 201\_5\_\_.

*[signature]*
MARCO A. HERNÁNDEZ
United States District Judge

16 - OPINION & ORDER